United States District Court
Southern District of Texas
**ENTERED**
August 11, 2016
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER LOCK and KEVIN MEYER,** | § § § | |
| *Plaintiffs,* | § § | **CIVIL ACTION NO. 4:14-CV-2766** |
| **v.** | § § § | |
| **CINDIA TORRES, DARREN FRANCIS, and CHARLES MCQUEEN, in their individual capacities, and HARRIS COUNTY, TEXAS,** | § § § § § § | |
| *Defendants.* | § § | |

**REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Pending before the Court are two motions for summary judgment, one Defendants Torres, Francis, and McQueen (the "Individual-Capacity Defendants") filed, and the other Defendant Harris County filed. [Dkt. 59 and 60.] The motions were referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [Dkt. 107.] The Court has considered the motions, responses, all other relevant filings,[1] and the applicable law. For the following reasons, the Court **RECOMMENDS** that both motions be **GRANTED**.

**I. BACKGROUND**

This lawsuit arises out of Plaintiffs' arrests at Plaintiff Kevin Meyer's ("Meyer") wedding reception. Plaintiffs bring suit claiming violations of their constitutional rights. On September 29, 2012, Slovanska Podporujici Jednota Statu Texas Lodge #88 (the "Lodge") in Houston, Texas hosted a wedding reception for Meyer, a deputy with the Harris County Sheriff's

---

[1] Plaintiffs filed responses to the motions for summary judgment [Dkt. 65, 66], and Defendants filed replies [Dkt. 68, 70]. Plaintiffs filed a surreply [Dkt. 76] and supplemental brief [Dkt. 108] in response to Defendant Harris County's motion for summary judgment. Plaintiffs and Defendant Harris County also filed supplemental expert reports [Dkt. 77, 104, 106].

Office, and his bride. Several hundred guests attended. (Torres Aff. ¶ 6 [Dkt. 59-4]; Francis Aff. ¶ 6 [Dkt. 59-3]; Kevin Meyer Dep. 10:22–25 [Dkt. 59-12].) Defendants Cindia Torres ("Torres") and Darren Francis ("Francis"), both off-duty Harris County Constable's Office Precinct 1 deputies, worked as security guards at the event. (Torres Aff. ¶¶ 3–4; Francis Aff. ¶¶ 3–4.) Torres wore her regular uniform. (Torres Aff. ¶ 6.) Francis was not in uniform but wore his badge, police identification on his collar, a gun, and handcuffs. (Francis Aff. ¶ 6; Torres Aff. ¶ 6.)

The reception featured an open bar serving sodas, water, and draft and canned beer. (Pechacek Aff. 1 [Dkt. 59-6].) Some guests brought their own wine and hard liquor as well. (Pechacek Aff. 1.) Around 8:30 p.m., bartender Cory Pechacek noticed a significant number of guests "who were dressed sloppy, slurring their words and stumbling." (Pechacek Aff. 2.) Concerned about safety and potential liability, Pechacek decided to stop serving alcohol and informed Torres, Francis, and Meyer's mother of his decision. (Pechacek Aff. 2; Francis Aff. ¶ 7; Torres Aff. ¶ 7.)

## A. Torres Arrests the Groom's Father, Robert Meyer

Some minutes later, Robert Meyer—Kevin Meyer's father—approached the bar area and began complaining to Pechacek and another bartender about the alcohol service being suspended. (Pechacek Aff. 2; Francis Aff. ¶ 8; Torres Aff. ¶ 8.) Francis intervened and told Robert Meyer that no more alcohol would be served. (Pechacek Aff. 2.) Robert Meyer protested, arguing that most of the guests were police officers who "could handle it themselves." (Francis Aff. ¶ 8; Torres Aff. ¶ 8.)

According to Torres and Francis, Robert Meyer then struck or pushed Francis on the left shoulder with his right hand. (Francis Aff. ¶ 8; Francis Dep. 15:3–4 [Dkt. 65-6]; Torres Aff. ¶ 8.)

Francis told Robert Meyer, "Don't put your hands on me." (Francis Aff. ¶ 8; Francis Dep. 15:5; Torres Aff. ¶ 8.) Robert Meyer said a few more words, stumbled backwards, and then struck or pushed Francis a second time. (Francis Aff. ¶ 8; Francis Dep. 15:7–8; Torres Aff. ¶ 8.) Torres approached, grabbed Robert Meyer, and began escorting him out of the room to handcuff him. (Francis Aff. ¶ 8; Torres Aff. ¶ 8; Pechacek Aff. 2–3.)

There is no dispute that Robert Meyer touched Francis, but other witnesses describe the force he used somewhat differently:

- Pechacek states that Robert Meyer initially "plac[ed] his hand" on Francis's left arm and then "pushed [Francis] again." (Pechacek Aff. 3.)

- Witness Louis Romano saw Robert Meyer "gently put his hand" on Francis while "attempting to hear what he was saying." Torres then "spun around" and told Robert Meyer "he was going to jail for assault." (Louis Romano Aff. 1 [Dkt. 65-3].)

- Witness Noxie Romano maintains that Robert Meyer merely "put his hand on [Francis's] shoulder." (Noxie Romano Aff. 1 [Dkt. 65-3].)

- Witness Marian Nelson states that Robert Meyer "reached towards" Francis's "arm or shoulder" but "did not appear to have touched him in an aggressive manner." (Nelson Statement 1 [Dkt. 65-2].)

## B. Kevin Meyer Intervenes.

Kevin Meyer ran over, followed by thirty to forty other individuals. (Pechacek Aff. 3.) According to Torres and Francis, Meyer grabbed Torres's shoulder or shirt collar. (Francis Aff. ¶ 9; Francis Sworn Statement 2 [Dkt. 59-3]; Torres Aff. ¶ 9.) Torres told Meyer to let go or she would place him under arrest. (Francis Sworn Statement 2.) When Meyer did not let go, Francis placed him in a bear-hug and told him to identify himself. (Francis Aff. ¶ 9; Francis Sworn

Statement 2.) Meyer responded that he was a police officer. (Francis Aff. ¶¶ 9–10; Torres Aff. ¶ 9.) Torres then got loose and handcuffed Meyer. (Francis Sworn Statement 2.)

Other witnesses recall the incident differently:

- According to witness Kelly Huey, Meyer did not grab Torres or Francis and "did not put up a fight, argue or do anything except what he was directed to do." (Huey Sworn Statement 4 [Dkt. 65-2].)

- Louis Romano states that "at no point did Kevin have to be restrained or interfere with the arrest of his dad." (Louis Romano Aff. 1.)

- Noxie Romano maintains that "at no time did Kevin Meyer touch or interfere with the arrest" of Robert Meyer. (Noxie Romano Aff. 1.)

- Margaret Vandever, who had a "clear, unobstructed view" of the scene, "did not see Kevin touch, and certainly not reach out and grab either of the Constables." (Vandever Sworn Statement 1 [Dkt. 65-2].)

## C. Lock Intervenes and Torres Orders Him to Leave.

Torres and Francis directed Robert and Kevin Meyer into a bar/lounge area. (Francis Aff. ¶ 10; Francis Sworn Statement 2; Torres Aff. ¶ 10.) As the deputies questioned Kevin Meyer, an increasingly noisy crowd began forming in the area. (Francis Aff. ¶ 10; Francis Sworn Statement 2; Torres Aff. ¶ 10.) Pechacek pulled a table in front of the doorway to prevent more people from crowding into the room and said he wanted everyone to leave. (Francis Aff. ¶ 10; Francis Sworn Statement 2; Torres Aff. ¶¶ 10, 13.) Francis and Torres told everyone—including individuals claiming to be police officers—to move away and leave the premises immediately or they would be arrested. (Francis Sworn Statement 2; Torres Aff. ¶¶ 10, 13; Francis Dep. 36:5–8; 39:3–6.)

Some individuals moved slowly towards the exit while others refused to leave at all. (Francis Sworn Statement 2; Torres Aff. ¶¶ 10–11.) Torres specifically noticed three men in the crowd who claimed to be police officers and refused to leave despite being told they would be arrested for criminal trespass. (Torres Aff. ¶ 11.) One of those men was Plaintiff Christopher Lock ("Lock"), a deputy with the Harris County Sheriff's Office. According to Torres, Lock shouted that he did not have to leave because he was a police officer, yelled to Kevin Meyer that he did not have to talk to Torres and Francis, and used profanity toward Torres. (Torres Aff. ¶ 11; Torres Dep. 61:12–20 [Dkt. 65-5].) Torres claims she escorted Lock to the exit and told him to leave the premises immediately or he would be arrested for criminal trespass. (Torres Sworn Statement 2 [Dkt. 65-2].) Lock replied that he was not leaving. (Torres Sworn Statement 2.)

Lock's account differs from Torres's. According to Lock, he approached the area where Kevin and Robert Meyer were being detained, identified himself as a police officer, and showed his identification. (Lock Dep. 82:22–7 [Dkt. 59-13].) Torres said nothing to him at first, but when Pechacek starting barricading the doorway, Torres told Lock and others to "get the fuck back, get back." (Lock Dep. 83:8–12; 85:12–14.)[2] Lock moved back about twenty feet into the hallway and remained there until Torres "started screaming at [him] again." (Lock Dep. 83:8–16.) Torres told Lock to "get the fuck out, and that [he] had two minutes to get the fuck out." (Lock Dep. 23:13–14.) Lock maintains that he left the property at that point and stood on the street outside. (Lock Dep. 25:9–13.) Lock claims he never exchanged words with Torres other than to identify himself and Kevin Meyer as police officers. (Lock Dep. 34:7–8; 85:1–3.)

Other witnesses recount the following regarding the interaction between Lock and Torres:

---

[2] Pechacek maintains that Torres and Francis never used vulgar language. (Pechacek Aff. 6.)

- Raquel Gonzalez, Kevin Meyer's wife, states that when Lock walked to the bar area to ask a question, Torres yelled at him and "told him to leave or he would be charged with trespassing." (Gonzalez Aff. 1 [Dkt. 65-2].) Lock then "walked out of the building and never returned." (*Id.*)

- According to witness Brandon Russell, Lock approached Torres and identified himself as a police officer. Torres responded that she "didn't give a fuck who he was" and told him to "back the fuck up." Lock "turned around and folded his hands behind his back and walked off." Torres replied to Lock, "Oh you want to be a smartass," but Lock continued walking away. (Russell Aff. 1–2 [Dkt. 65-2].)

## D. Sergeant McQueen Arrives.

Torres contacted dispatch and requested a supervisor and backup units. (Torres Aff. ¶ 13.) Three deputies arrived within minutes. (Torres Sworn Statement 2.) One deputy took Robert Meyer to a police car, and another escorted Kevin Meyer out of the building. (Torres Sworn Statement 2.) Harris County Constable Precinct 1 Sergeant Charles McQueen also arrived at the scene. (Francis Aff. ¶ 11; Torres Aff. ¶ 18; McQueen Aff. ¶¶ 3, 6 [Dkt. 59-5].) The record is unclear as to the precise sequence of events that followed.

Lock maintains that McQueen told him to return to the scene, permitted Lock to remain near his truck in the Lodge's parking lot, and subsequently gave Lock permission to use the restroom at the Lodge. (Lock Sworn Statement 2 [Dkt. 65-2].) As Lock returned to his truck, McQueen approached and advised him that he was going to jail for criminal trespass. (*Id.*) For his part, McQueen denies giving Lock permission to return to the scene. (McQueen Dep. 79:11–12; 92:7–11 [Dkt. 65-9].) Torres did not hear McQueen give Lock permission to return to the

Lodge's premises but states that McQueen later told her he had done so. (Torres Dep. 111:12–22.)

Torres and Francis spoke to McQueen in the parking lot. (Torres Aff. ¶ 18; Francis Aff. ¶ 11; McQueen Aff. ¶¶ 7–8.) McQueen asked Francis to talk to Torres about not filing charges because Meyer and Lock were police officers. (Francis Sworn Statement 3.) McQueen also suggested to Torres that she turn Meyer and Lock over to sheriff's office supervisors instead of arresting them, so as "to avoid bad blood between [the] offices." (Torres Aff. ¶ 18.) McQueen told Torres that if she was going to press charges, she needed to call the Harris County District Attorney's Office, report that Lock and Meyer were sheriff's deputies, and state that Lock had returned to the premises after being instructed to do so. (Torres Dep. 108:7–17; 109:13–25.) According to Torres's affidavit and deposition, she had called an assistant district attorney ("ADA") before speaking to McQueen, and the ADA had already accepted the charges against the Meyers and Lock. (Torres Aff. ¶¶ 14, 18; Torres Dep. 106:1–11; 108:15–17; 109:3–6.) Francis claims that he "was not a part of and did not overhear" Torres's conversation with the ADA. (Francis Aff. ¶ 12.) In a sworn statement, however, Torres recounted that she and Francis decided to file the charges *after* speaking to McQueen. (Torres Sworn Statement 3.)

Torres claims that she informed the ADA that Lock returned to the premises after McQueen told him to do so, but maintains she filed charges against Lock based on his refusal to leave the premises *prior* to McQueen's arrival. (Torres Dep. 109:22–25; 110:13–19; 111:9–11; Torres Aff. ¶ 19.) Torres has also stated that she "had no knowledge of McQueen allegedly giving Lock permission to return" to the premises and that, even if McQueen had done so, Pechacek—not McQueen—had authority over access to the Lodge. (Torres Aff. ¶ 19.) Torres further claims that there was no reason for her to tell the ADA that the subjects were police

7

officers because their status as such did not "allow them to break the law." (Torres Dep. 109:5–6; Torres Aff. ¶ 18.)

Katie Warren, the ADA with whom Torres spoke, did not recall Torres telling her that the arrestees were police officers but explained that that information would not have changed her decision to accept the charges. (Warren Dep. 9:4–5, 15 [Dkt. 65-8].) Warren did not recall Torres telling her that Lock had been told to remain at or return to the scene and states that that information would likely have been relevant to her assessment of the criminal trespass charge. (*Id.* 9:22–10:13.)

About ten minutes after arriving at the Lodge, McQueen called his supervisor, Lieutenant John Marroquin, to report on the situation. (McQueen Aff. ¶ 8.) Marroquin told McQueen that it was Torres's arrest to make and that McQueen should not force Torres to release the suspects if charges were warranted. Marroquin also told McQueen to make sure Torres called the district attorney's office first. McQueen saw Torres speaking on the phone and "trusted her as a peace officer to call the DA as required." (*Id.*)

McQueen never went into the Lodge and did not personally observe any of the events leading to the arrests. (McQueen Aff. ¶¶ 8–9.) Although he personally felt that it would have been better to turn Meyer and Lock over to sheriff's office supervisors rather than file criminal charges against them, he maintains it was Torres's decision to make and that she did not act unreasonably. (McQueen Aff. ¶ 9.) In McQueen's view, Torres "had total probable cause for her actions at the scene." (McQueen Dep. 92:5–6.)

### E.  Basis for Arrests and Subsequent Developments.

According to Torres, she arrested Kevin Meyer for interfering with public duties when he grabbed and pulled her while she was detaining Robert Meyer.[3] (Torres Aff. ¶ 16.) Torres states that she arrested Lock for criminal trespass because "he refused to leave after repeatedly being told to leave."[4] (Torres Aff. ¶ 17.) Specifically, Torres maintains that Lock committed a criminal trespass when he remained on the premises after receiving notice to depart from "a representative with the apparent authority to act for the owner of the property"—i.e., Pechacek and Torres, in her capacity as a security guard for the Lodge. (Torres Aff. ¶ 12.)

Kevin Meyer, Robert Meyer, and Lock were booked into Harris County jail and charged. (Torres Sworn Statement 3; Certified Charging Instruments [Dkt. 59-10 and 59-11]). Judge Pam Derbyshire of Harris County Criminal Court No. 7 found probable cause for their detention and set bail. (Cert. Prob. Cause Orders [Dkt. 59-8 and 59-9].) On October 5, 2012, a court found probable cause for the arrests but later dismissed the charges. (Smith Aff. ¶ 12 [Dkt. 59-7].)

---

[3] Section 38.15(a)(1) of the Texas Penal Code provides that a person commits the offense of interference with public duties "if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." TEX. PENAL CODE ANN. § 38.15(a)(1).

[4] The Texas criminal trespass statute reads in relevant part:

> A person commits an offense if he enters or remains on property or in a building of another without effective consent and he:
>
> > (1) had notice that the entry was forbidden; or
> > (2) received notice to depart but failed to do so.

TEX. PENAL CODE ANN. § 30.05(a)(1)–(2); see also Bader v. State, 15 S.W.3d 599, 606 (Tex. App.—Austin 2000, pet. ref'd) ("The elements of criminal trespass are that: (1) a person, (2) without effective consent, (3) enters or remains on the property or in a building of another, (4) knowingly, intentionally, or recklessly, (5) when he had notice that entry was forbidden or received notice to depart and failed to do so.").

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.' " *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (internal quotation marks omitted); *see also Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the non-movant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

"A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted), *aff'd*, 563 U.S. 277 (2011). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.*

If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. *United States v. $92,203.00 in U.S.*

*Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). But if the moving party meets its initial burden, "the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.' " *Nola Spice*, 783 F.3d at 536 (quoting *EEOC*, 773 F.3d at 694). The non-movant must identify specific evidence in the record and articulate how that evidence supports its claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.' " *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the non-moving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

### III. DISCUSSION

Plaintiffs bring suit under 42 U.S.C. § 1983, alleging that Defendants violated their Fourth and Fourteenth Amendment right to remain free from unlawful arrest. (Am. Compl. ¶¶ 2–12 [Dkt. 13].) Section 1983 provides a cause of action against any individual who "under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives another of rights secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. To state a claim under § 1983, " 'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.' " *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)). A plaintiff must establish that the defendant was either personally involved in the deprivation or that his

wrongful actions were "causally connected" to the deprivation. *Id.* (citing *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999)).

## A. The Individual-Capacity Defendants' Motion for Summary Judgment.

Plaintiffs assert six counts against the Individual-Capacity Defendants. Meyer alleges that Torres arrested him without probable cause (Am. Compl. ¶¶ 108–17) and that Francis failed to protect him from that unlawful arrest (Am. Compl. ¶¶119–23). Lock claims that: Torres arrested him without probable cause (Am. Compl. ¶¶ 72–86); Francis and McQueen each failed to protect him from that unlawful arrest (Am. Compl. ¶¶ 87–96); and McQueen unreasonably failed to supervise Torres when she arrested Lock (Am. Compl. ¶¶ 97–106). The Individual-Capacity Defendants move for summary judgment on the basis of qualified immunity. (Indiv. Defs.' MSJ 8–9, 13–17, 26–45 [Dkt. 59].)[5]

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity "is an affirmative defense; once properly raised by the defendant, the plaintiff has the burden to negate the assertion of qualified immunity." *King v. Handorf*, ___ F.3d ___, ___, 2016 WL 2621454, at *2 (5th Cir. May 6, 2016) (internal quotation marks omitted); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (although all inferences are still drawn in the plaintiff's favor, it is the plaintiff who "bears the burden of negating

---

[5] The Individual-Capacity Defendants' motion suggests a second basis for summary judgment—namely, that Plaintiffs have failed to supply sufficient admissible evidence that the Defendants "engaged in wrongful conduct," that the "wrongful conduct caused the violation of the Plaintiffs' rights," and that the wrongful conduct "amounted to deliberate indifference." (Indiv. Defs.' MSJ 8–9.) However, Defendants' briefing fails to meaningfully distinguish this argument from the qualified-immunity defense. Moreover, in their reply, the Individual-Capacity Defendants clarify that their motion for summary judgment "is based on their right to qualified immunity." (Indiv. Defs.' Reply 2 [Dkt. 68].) The Court will therefore consider all of the arguments under the qualified-immunity framework.

qualified immunity"). A plaintiff can overcome a qualified-immunity defense by showing: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016) (per curiam) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)) (internal quotation marks omitted). A court has discretion to decide which of these two prongs to consider first. *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal citations and quotation marks omitted).

**1. Torres Is Entitled to Summary Judgment under the Fifth Circuit's Independent Intermediary Doctrine.**

"The right to be free from arrest without probable cause is a clearly established constitutional right." *Hebert v. Maxwell*, 214 F. App'x 451, 454 (5th Cir. 2007) (quoting *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994)) (internal quotation marks omitted). Thus, to succeed on their unlawful-arrest claims, Plaintiffs must demonstrate that Torres lacked probable cause in arresting them. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) ("The constitutional claim of false arrest requires a showing of no probable cause."); *Sanders v. English*, 950 F.2d 1152, 1159 (5th Cir. 1992).

The test for "probable cause" is whether the officer, at the time of arrest, "had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime." *Mangieri*, 29 F.3d at 1016 (quoting *Duckett v. City of Cedar Park*, 950

F.2d 272, 278 (5th Cir. 1992)) (internal quotation marks omitted). Courts use an objective standard in assessing probable cause, meaning that they will find that probable cause existed if the officer was aware of the facts, particularized to the arrestee, justifying a reasonable belief that an offense was being committed, regardless of whether the officer charged the arrestee with that specific offense. *Club Retro*, 568 F.3d at 204. "Police officers who reasonably but mistakenly conclude that probable cause is present are entitled to qualified immunity." *Mangieri*, 29 F.3d at 1017 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). If reasonable public officials could differ as to whether the officer's actions were lawful, the officer is entitled to immunity. *Hebert*, 214 F. App'x at 454 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). However, where determination of whether probable cause existed "turns on whose story is more believable"—i.e., the plaintiff's or the arresting officer's—it involves "a credibility determination that is not resolvable at the summary judgment stage." *Cooper v. Killeen Indep. Sch. Dist.*, No. A-07-CA-082 LY, 2008 WL 194358, at *6 (W.D. Tex. Jan. 23, 2008) (denying motion for summary judgment where plaintiff disputed facts upon which defendant's assertion of probable cause was based); *see also Crouch v. Whatley*, 900 F. Supp. 1567, 1574 (M.D. Ala. 1995) (denying summary judgment in favor of police officer on qualified-immunity grounds; plaintiff contradicted officer's version of events, creating a genuine dispute as to whether probable cause existed for his arrest).

When a plaintiff alleges that an officer made an arrest without probable cause, the Fifth Circuit applies the "independent intermediary doctrine." *Buehler v. City of Austin/Austin Police Dep't*, No. 15-50155, ___ F.3d ___, ___, 2016 WL 3085528, at *3 (5th Cir. June 1, 2016); *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010). Under that doctrine, " 'if facts supporting an arrest are placed before an independent intermediary such as a magistrate

[judge] or grand jury, the intermediary's decision breaks the chain of causation' for the Fourth Amendment violation." *Jennings v. Patton*, 644 F.3d 297, 300–01 (5th Cir. 2011) (quoting *Cuadra*, 626 F.3d at 813); *Buehler*, 2016 WL 3085528, at *3. This rule applies "even if the independent intermediary's action occurred after the arrest, and even if the arrestee was never convicted of any crime." *Buehler*, 2016 WL 3085528, at *3; *see also Rollins v. Hattiesburg Police Dep't*, No. 2:14CV61-KS-MTP, 2015 WL 4276386, at *8–9 (S.D. Miss. July 14, 2015) (municipal court judge's post-arrest finding that plaintiffs were guilty of disorderly conduct broke the chain of causation for false arrest, even though the county court later dismissed all criminal charges).

The independent intermediary doctrine does not insulate an officer from liability if the plaintiff shows "that the deliberations of th[e] intermediary were in some way tainted by the actions of the defendant." *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988). To satisfy this exception, however, a plaintiff must do more than simply show that the circumstances surrounding the arrest "were subject to different interpretations" or that the officer represented "one version of the disputed facts" to the intermediary. *Buehler*, 2016 WL 3085528, at *5; *Anderson v. City of McComb, Miss.*, 539 F. App'x 385, 387 (5th Cir. 2013). Rather, the plaintiff must demonstrate that the intermediary's finding of probable cause was tainted by the officer's "knowing misstatements or omissions." *Buehler*, 2016 WL 3085528, at *5; *Anderson*, 539 F. App'x at 387 (evidence was insufficient to show that police chief "deliberately made knowingly false statements or disregarded the truth" in seeking arrest warrant); *Kugle v. Shields*, No. 93-5567, 62 F.3d 395, 1995 WL 450219, at *4 (5th Cir. July 7, 1995) ("[O]fficers who maliciously or reckless[ly] misrepresent or omit material information in presenting such information are not shielded from liability.").

15

The Court concludes that the independent intermediary doctrine precludes Plaintiffs' claims against Torres. Judge Derbyshire's initial finding of probable cause, and the state court's subsequent finding to the same effect, broke the chain of causation for any violation of Plaintiffs' constitutional rights.[6] That the state court later dismissed the charges is irrelevant. *See Buehler*, 2016 WL 3085528, at *3; *Rollins*, 2015 WL 4276386, at *8–9. Plaintiffs maintain that the independent intermediary doctrine does not apply here because there is a genuine dispute regarding the facts underlying Torres's arrest of Kevin Meyer and Lock. (Pls.' Resp. to Harris County's MSJ 20–21 [Dkt. 66].) However, Plaintiffs offer nothing that shows a triable issue as to whether Defendants tainted the court's findings of probable cause via knowing falsehoods or omissions. *See Buehler*, 2016 WL 3085528, at *5. At most, Plaintiffs demonstrate that the events leading to their arrests were subject to differing accounts and that Torres presented only her version of the legitimately disputed facts to the state court.[7] That is not enough to avoid operation of the independent intermediary doctrine. *See id.*, at *5; *Anderson*, 539 F. App'x at 387. Accordingly, Torres is entitled to summary judgment on qualified-immunity grounds.

---

[6] Defendants' claim that the ADA's decision to accept the charges also satisfies the independent intermediary doctrine is plainly incorrect. (*See* Harris County's MSJ 13 [Dkt. 60-16].) As the Fifth Circuit has held, "an assistant district attorney is not an 'impartial intermediary.' " *Hale v. Fish*, 899 F.2d 390, 401 (5th Cir. 1990).

[7] For example, Torres claims that she arrested Kevin Meyer for the offense of "interference with public duties" because "he interfered with [her] detaining Robert Meyer by grabbing [Torres] and pulling [her] away as [she] detained Robert Meyer." (Torres Aff. ¶ 16.) However, several witnesses maintain that Kevin Meyer never touched Torres and did not interfere with his father's arrest in any way. (Huey Sworn Statement 4; Louis Romano Aff. 1; Noxie Romano Aff. 1; Vandever Sworn Statement 1.) As to Lock, Torres maintains she arrested him for the offense of criminal trespass because "he refused to leave after repeatedly being told to leave." (Torres Aff. ¶ 17.) In particular, Torres claims that Lock remained on the Lodge's premises after she and Pechacek directed him to depart. (Torres Aff. ¶ 12.) Torres claims that she repeatedly told Lock to leave the premises, that Lock repeatedly refused to do so, and that she ultimately had to escort Lock to the exit. (Torres Aff. ¶ 11; Torres Dep. 61:12–20; Torres Sworn Statement 2.) However, Lock claims that he complied with Torres's initial instructions to "get back" as well as her subsequent instructions to leave the premises. (Lock Dep. 83:8–16; 23:13–14; 25:9–13.) Other witnesses corroborate Lock's account. (Gonzalez Aff. 1; Russell Aff. 1–2.)

## 2. Francis and McQueen Are Also Entitled to Summary Judgment.

Meyer and Lock both claim that Francis is liable for failing to protect them from unlawful arrest by Torres. Lock asserts the same claim against McQueen. The Fifth Circuit has clearly held that "an officer may be liable under § 1983 under a theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.' " *Whitley v. Hanna*, 726 F.3d 631, 646–47 & n.11 (5th Cir. 2013) (quoting *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002)); *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) ("[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983."); *accord Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.").[8] However, bystander liability will not attach where an officer is not present at the scene of the constitutional violation. *Whitley*, 726 F.3d at 646–47 & n.12; *see also Ibarra v. Harris Cnty., Tex.*, 243 F. App'x 830, 835 & n.8 (5th Cir. 2007) (per curiam) (unpublished) ("A bystander liability claim requires the plaintiffs to show that the officer was present at the scene and did not take reasonable measures to protect a suspect from excessive force.").

---

[8] Defendants do not dispute that this is clearly-established law. Moreover, while most bystander-liability cases have involved excessive-force claims, the Fifth Circuit has squarely affirmed that "other constitutional violations also may support a theory of bystander liability." *Whitley*, 726 F.3d at 647 n.11; *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (for a right to be clearly established in the qualified-immunity context, a case directly on point is not required, but existing precedent must have placed the question beyond debate); *cf. Perez v. Tedford*, No. SA-13-CV-429-XR, 2013 WL 6835234, at *2–3 & n.2 (W.D. Tex. Dec. 23, 2013) (holding that there is no "clearly established" duty for officers to intervene to prevent or mitigate a First Amendment violation because "the obligation of an officer to step in to prevent a fellow officer from making statements that may constitute unlawful retaliation is a novel legal issue").

Lock also seeks to hold McQueen liable as Torres's supervisor for failing to prevent Torres from unlawfully arresting him. As a general matter under § 1983, "a supervisor is not personally liable for his subordinate's actions in which he had no involvement." *James*, 535 F.3d at 373. An officer not personally involved in acts that deprived a plaintiff of his constitutional rights is only liable under § 1983 if: (1) the officer failed to supervise the other officers involved; (2) there is a causal connection between the alleged failure to supervise and the alleged violation of the plaintiff's rights; and (3) the failure to supervise constituted "deliberate indifference" to the plaintiff's constitutional rights. *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001); *Kohler v. Englade*, 470 F.3d 1104, 1115 (5th Cir. 2006). "Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Thompson*, 245 F.3d at 459 (plaintiff must generally demonstrate a pattern of similar violations). As the Fifth Circuit has stated:

> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Deliberate indifference requires a showing of more than negligence or even gross negligence. Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity.

*Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381–82 (5th Cir. 2005) (internal brackets, quotation marks, and footnotes omitted).

Inasmuch as the independent intermediary doctrine precludes Plaintiffs' unlawful-arrest claims against Torres, it also requires summary judgment against Plaintiffs' bystander-liability and failure-to-supervise claims. By precluding a finding that Torres's arrests were unlawful under the Fourth Amendment, the state court's probable-cause determinations simultaneously

insulate Francis and McQueen from any liability for failing to intervene to prevent those arrests. *See Gilbert v. French*, 364 F. App'x 76, 83 (5th Cir. 2010) (finding that no officer used excessive force required court to "simultaneously conclude that no officer unconstitutionally failed to intervene" to prevent the use of such force). Moreover, McQueen was not present at the scene when the events giving rise to the arrests occurred, so he cannot be liable as a bystander. Similarly, because the state court's probable-cause findings broke the causal chain between Torres's actions and any resulting constitutional harm, they *a fortiori* broke any causal connection between McQueen's alleged failure to supervise Torres and the alleged harm. *See Shields v. Twiss*, 389 F.3d 142, 150–51 (5th Cir. 2004) (applying independent intermediary doctrine to bar failure-to-supervise claim against county).

Accordingly, the Court concludes that the Individual-Capacity Defendants' motion for summary judgment should be granted as to all of the claims against Torres, Francis, and McQueen.

## B. Harris County's Motion for Summary Judgment

Plaintiffs assert six counts against Defendant Harris County. Specifically, Meyer and Lock each alleges that Harris County has an unconstitutional "policy, procedure, custom, or practice" of: (1) failing to supervise or discipline constable officers who make unlawful arrests (Am. Compl. ¶¶ 124–55); (2) shielding constable officers from the consequences of their unlawful arrests (Am. Compl. ¶¶ 156–72); and (3) rubber-stamping recommendations from subordinates regarding the selection, hiring, firing, supervision, discipline, training, and activities of deputies employed by Harris County Constable's Office Precinct 1 (Am. Compl. ¶¶ 173–78).

### 1. Legal Standard for Municipal Liability

"Municipal liability cannot be sustained under a theory of *respondeat superior*. [T]he unconstitutional conduct must be directly attributable to the municipality through some sort of

official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (alteration in original) (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997), and *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)) (internal quotation marks omitted). To hold Harris County liable for its officers' constitutional violations, Plaintiffs must show that: (1) the constitutional violation was caused as the direct result of the execution of an official "custom" or "policy"; (2) the custom or policy was approved or sanctioned by the county's final policymaker; (3) the final policymaker acted with deliberate indifference; and (4) the custom or policy was the "moving force" behind the violation. *See Brown*, 520 U.S. at 403–04; *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1416 (5th Cir. 1997) (en banc).

Official policy "usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009) (internal quotation marks omitted). "A customary policy consists of actions that have occurred for so long and with such frequency that the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 169 (5th Cir. 2010); *see also Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) ("Deliberate indifference to claims of such civil rights violations—tantamount to a custom or policy sufficient to support municipal liability under § 1983—may be inferred from a municipality's lack of appropriate response to repeated complaints of such violations."). "A pattern requires similarity and specificity; prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Peterson*, 588 F.3d at 851 (internal quotation marks and alteration

20

omitted). "Proof of a single instance of unconstitutional activity is [generally] not sufficient for § 1983 municipal liability." *Valentine Foundation v. Uphoff*, 211 F. App'x 276, 278 (5th Cir. 2006) (citing *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989)). "Furthermore, a 'handful' of instances do not constitute a pervasive custom or practice." *Garza v. Harris Cnty., Tex.*, 2011 WL 3925020, at *4 (S.D. Tex. Sept. 7, 2011) (Harmon, J.) (citing *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002)); *Saenz v. Dallas Cnty. Cmty. College Dist.*, 2011 WL 1935742, at *8 (N.D. Tex. May 16, 2011).

Municipal liability may be based on the decisions of employees with final policymaking authority or the ratification by such final policymakers of the decisions of subordinates to whom authority was delegated subject to these policymakers' review and approval. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–27. Municipal liability may also stem from injuries caused by a failure to adequately train or supervise employees, so long as that failure results from "deliberate indifference" to the injuries that may be caused. *City of Canton v. Harris*, 489 U.S. 378, 388–91 (1989).

## 2. Harris County Is Entitled to Summary Judgment.

The independent intermediary doctrine mandates summary judgment on Plaintiffs' municipal-liability claims. In *Shields v. Twiss*, 389 F.3d 142 (5th Cir. 2004), a plaintiff asserted claims under § 1983 against (1) a county deputy for unreasonable arrest, unreasonable detention, malicious prosecution, and unreasonable investigation, and (2) the county itself for failing to supervise the deputy. *Id.* at 150. In affirming the district court's entry of summary judgment against the plaintiff, the Fifth Circuit first held that the independent intermediary doctrine shielded the deputy from liability. *Id.* Then, turning to the claims against the county, the Fifth Circuit held that because there was no "genuine issue of fact" concerning whether the deputy

"deprived [the plaintiff] of any rights protected by the Constitution," the county could not be held liable for failing to properly supervise the deputy. *Id.* at 151.

Here, as the Court has explained, the independent intermediary doctrine precludes any finding that Torres, Francis, or McQueen infringed Plaintiffs' constitutional rights. Applying *Shields*, this means that Harris County cannot be liable under the theories of municipal liability Plaintiffs assert. *See id.* (emphasizing that municipal liability attaches "where a deprivation of a right protected by the Constitution or by federal law is caused by an official policy" (quoting *Burge v. St. Tammany Parish,* 336 F.3d 363, 369 (5th Cir. 2003))); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

Harris County also argues that summary judgment is warranted because Plaintiffs have failed to show that the county has an unwritten policy[9] approving unlawful arrests, that a pattern of similar constitutional violations occurred, or that the relevant final policymaker acted with deliberate indifference. (Harris County's MSJ 14–17.)   The Court agrees. Plaintiffs specifically point only to their own allegedly unlawful arrests, which is insufficient evidence of a purported unconstitutional policy or custom. *See Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (per curiam) (en banc) ("If actions of [municipal] employees are to be used to prove a custom for which the municipality is liable, those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [municipal] employees."); *Villalba v. City of Laredo*, No. 5:14-CV-17, 2015 WL 5038337, at *3 (S.D. Tex.

---

[9] Plaintiffs do not dispute that the county's *written* search-and-seizure policy (Ex. 16 to Harris County's MSJ) is constitutional on its face.

Aug. 26, 2015) (Kazen, J.) (to hold city liable under failure-to-train theory based on conduct of one officer on one occasion "would be akin to *respondeat superior*").[10]

Plaintiffs cite expert testimony from Robert Clark regarding certain deficiencies in Harris County's supervision, discipline/retraining, and retention policies. (Clark Report, Ex. A to Pls.' Resp. to Harris County's MSJ [Dkt. 66-1].) Plaintiffs argue that Clark's report shows that the county was deliberately indifferent to the rights of persons with whom the police come into contact. However, "[s]tanding alone, an expert's opinion is generally not enough to establish deliberate indifference." *Thompson*, 245 F.3d at 459. Here, Clark's report cannot make up for the overall dearth of evidence supporting Plaintiffs' claims.

Plaintiffs also argue that Harris County has ratified the allegedly unlawful arrests by failing to discipline Torres and others. (Pls.' Resp. to Harris County's MSJ 21.) A "policymaker's ratification of a subordinate's misconduct may cause the municipality to be liable if the policymaker approves a subordinate's decision and the basis for it"; however, "the Fifth Circuit has limited this theory to 'extreme factual situations.' " *Villalba*, 2015 WL 5038337, at *4 (quoting *Peterson*, 588 F.3d at 848). *Compare Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (finding ratification-liability where a group of police officers mistook a man for a fugitive, surrounded his truck, "poured" gunfire onto his truck, and killed him because the city policymaker failed to reprimand, discharge, or admit that any error occurred on behalf of its officers), *with Snyder v. Trepagnier*, 142 F.3d 791, 797–98 (5th Cir. 1998) (refusing to find ratification-liability where plaintiff was shot in the back by a police officer while fleeing on foot from police after a high-speed chase, despite arguments that the city knew about the police

---

[10] Plaintiffs contend that Torres unlawfully arrested one other individual on a prior occasion, and that the county knew about that incident. (Pls.' Resp. to Harris County's MSJ 22 & n.109.) Even assuming that to be true, it would at most show "a handful" of relevant instances, not "a pervasive custom or practice." *Garza*, 2011 WL 3925020, at *4; *Pineda*, 291 F.3d at 329 (eleven incidents of warrantless searches did not establish a "persistent widespread practice" or an unwritten municipal custom).

misconduct and did nothing). There is no "extreme" fact pattern here. *See Osborne v. Harris Cnty., Tex.*, 97 F. Supp. 3d 911, 939–40 (S.D. Tex. 2015) (Rosenthal, J.) (finding that "Fifth Circuit precedent foreclose[d] ratification liability" where one officer used "some force to respond to [plaintiff]'s resistance to the other three deputies' unlawful search of his apartment").

Because the foregoing provides a sufficient basis for granting summary judgment in favor of Harris County, the Court does not pass on the county's additional argument that the Harris County Precinct 1 Constable is not a final policymaker for Harris County.

## CONCLUSION

The Court **RECOMMENDS** that: (1) the Individual-Capacity Defendants' motion for summary judgment be **GRANTED** and (2) Harris County's motion for summary judgment be **GRANTED**.

The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).

Dated:  August 11, 2016

**DENA HANOVICE PALERMO**
**UNITED STATES MAGISTRATE JUDGE**